IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| KELLY JO SUTER, Ph.D. | § | |
| *Plaintiff* | § | |
| | § | |
| vs. | § | |
| | § | No. 10-CV-692-OLG |
| THE UNIVERSITY OF TEXAS AT | § | |
| SAN ANTONIO, GEORGE PERRY, Ph.D., | § | |
| JAMES M. BOWER, Ph.D. | § | |
| MATTHEW J. GDOVIN, Ph.D., | § | |
| ROBERT W. GRACY, Ph.D., | § | |
| J. AARON CASSILL, Ph.D., and | § | |
| EDWIN J. BAREA-RODRIGUEZ, Ph.D. | § | |
| *Defendants* | § | |

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS
and FOR SUMMARY JUDGMENT

TO THE HONORABLE DISTRICT COURT JUDGE:

COMES NOW, Kelly Jo Suter, Ph.D., Plaintiff herein and files this Response in Opposition to Defendants' Motion to Dismiss or for Summary Judgment as follows:

I.

STATEMENT OF FACTS

1.     Dr. Suter is an Assistant Professor of Biology at UTSA, although she has been awarded the rank of Associate Professor with tenure effective September 2011. She was extended a written offer of employment by Dr. Perry on behalf of UTSA in May 2006 as a faculty member in the Biology Department. *Exhibit "1."* According to the letter, if approved, she would hold the title of Assistant Professor without tenure with a 9 month salary of $75,000.00 and a full release from teaching for the first year, with normal duties thereafter. In addition, she was to receive $200,000.00 for equipment and $30,000.00 in supplies to establish a lab at UTSA, and understood she would have until July 2007 to spend these funds. In connection with the offer of

employment Dr. Suter spoke with Dr. Cassill who was the Chair of the Biology Department and with Dr. Wilson who was the Chair of the Faculty Search Committee. She also communicated with Dr. Bower.   Because Dr. Suter did not consider UTSA's offer to be competitive or sufficient to establish a laboratory, it is now undisputed that Dr. Bower offered additional start-up funds from a UTHSC source.   Based on these communications, Dr. Suter understood that in addition to her annual salary and moving expenses, she would have $330,000.00 to build a laboratory at UTSA, and that these funds would be available upon her arrival or soon thereafter so that she could purchase equipment and supplies to build her lab.   *Exhibit "A."*

2.      In connection with Dr. Suter's recruitment, she interviewed with Defendants Perry, Cassill, Bower, and Gdovin during in April 2006.   During these interviews Dr. Suter discussed her grants and informed each of them that she was leaving the University of Louisville because University officials had not been forthcoming regarding the availability of start-up resources and as a consequence she never transferred her grants to that institution. In addition, faculty forum minutes, RCMI meeting notes and emails obtained through an open records request during May and June of 2006 reflect that defendants Perry, Cassill, Bower, and Gdovin were present in meetings where they discussed that I had active grants including an R01 from NIH which I would be bringing with me to UTSA. At no time did any of these defendants ever inform Dr. Suter that any portion of the start-up funds she was offered would come from a carry forward request. If she had been informed of this fact she would have declined the offer because carry forward requests are contingent and there could be no guarantee that it would be awarded.   *Exhibit "A."*

3.      Based on the written offer of employment and Dr. Suter's discussions with Dr. Cassill, Dr. Wilson and Dr. Bower, I accepted the offer and arrived at UTSA at the end of June 2006; although my appointment wasn't effective until August 18, 2006.   *Exhibit "A."* Dr. Suter's equipment

request form was approved by her Department Chair, the Dean, and the Provost's office between July 3-7, 2006 in the total amount of $229,353.00. *Exhibit "A."*

4.      After Dr. Suter arrived at UTSA, her initial efforts were directed at completing the paperwork to have her grants transferred to UTSA. Grants are transferred pursuant to an application for change of grantee institution. In some cases it can take as long as a year to complete a grant transfer although 6 months is typical. In the Change of Grantee Organization application, Dr. Suter specifically represented that none of the grants funds would be used to build her lab or re-establish her transgenic animal colonies.  *Exhibit "A."*

5.      UTSA completed applications requesting that NIH transfer her grants to UTSA in early August 2006. If NIH had been aware that Dr. Suter would not have the resources to carry out the research objectives of her grants, it would not have agreed to transfer them.  *Exhibit "A."* After the applications for change of grantee institution were finalized, Dr, Suter started the process of submitting purchase requests to UTSA administrative personnel in order to obtain the equipment and supplies she needed to build a laboratory to continue her research. Some of the equipment she needed was highly specialized and expensive, and typically took 2-4 months after the vendor receives the equipment order for the equipment to arrive.  *Exhibit "A."*

6.      During October 2006, Dr. Suter went to check on the status of her orders with the RCMI Program Manager, Ms. Peggy Evilsizer, and learned for the first time that she did not have enough funds for her purchases. After learning of this situation, the RCMI Program Director Dr. Gdovin went to explain to Dr. Suter that her RCMI equipment funds were coming from a 2005/2006 carry forward request, but that the University was going to cover those funds pending receipt of those funds. When this didn't happen, he later said he had set up a shell account and then later he said he had some RCMI funds for her. Dr. Suter relied on Dr. Gdovin's representations between October

2006 and March or April 2007 and placed orders in reliance. *Exhibit "A."*

7.       In December 2006, Dr. Suter forwarded Dr. Gracy via email unpaid bills from Charles

Rivers which were to have been paid from the RCMI supply funds. Charles Rivers had contacted

Dr. Suter because the bills had not been paid for her animals. I wrote to Dr. Gracy in his capacity as

Principle Investigator of the RCMI grant, and he replied that he would take care of the bills.

Despite his representation Dr. Suter was contacted again for non-payment in March 2007, and she

finally paid the bills she was being threatened with collection.   *Exhibit "A."*

8.       In early May 2007 Dr. Suter received an e-mail from one of the equipment vendors asking

if she intended to order the microscope she had requested a quote for in February 2007. She replied

that she thought it had already been ordered. In April 2007, Dr. Suter communicated with the

RCMI Program Manager, Ms. Evilsizer regarding the status of her orders, and Ms. Evilsizer

verbally assured her that a chemical order would be delivered later in the month.   However, on

May 1, during an e-mail exchange Ms. Evilsizer informed Dr. Suter the order she had placed on

4/20/07 had been returned for lack of funds and that she could not order the microscope because

there were no funds.   Dr. Suter was finally provided with funds to replace the missing RCMI

equipment funds from the Biology Department between May and October 2007. *Exhibit "A."*

9.       In May 2007, Dr. Suter asked Dr. Cassill when he knew that the RCMI portion of her

start-up package was dependent on a carry-forward request. Although Dr. Cassill never answered

the question, he replied that those offers don't mean anything since the institution can change them

at any time. The first time Dr. Suter discovered that Dr. Cassill knew that her RCMI equipment

funds were to come from a carry forward request was during his deposition in this case. *Exhbiit*

*"A."*

10.       In June 2009, Dr. Suter spoke with Dr. Perry about the problems she had experienced with

her lack of start-up funds.   She asked him when he first knew that the RCMI portion of the funds was dependent on a carry forward request and he told her he didn't know about it until September 2006 when Dr. Bower asked him to cover the RCMI component. Dr. Perry told her he never would have made 2 offers if he had known of this fact because the College didn't have an extra $100,000.00 "lying around."   Dr. Suter learned for the first time in Dr. Perry's deposition that he now claims he understood the original plan was for the RCMI portion of Dr. Suter's start up funds to come from a carry forward request.  *Exhibit "A."*

11.        In November 2009, Dr. Suter encountered Dr. Bower and wanted to confirm what Dr. Perry had told her in June. She asked Dr. Bower when he first asked Dr. Perry to cover the missing RCMI portion of her start-up package and replied September 2006. When Dr. Suter asked him how many times he had asked Dr. Perry, Dr. Bower replied "many, many." Although she asked him when he intended to tell her about the missing funds, and he just walked away. Dr. Suter discovered for the first time that Dr. Bower knew Dr. Gdovin was planning to put her RCMI equipment funds in a carry forward request as early as May 2006 in based on documents produced in discovery in this case and Dr. Bower's deposition testimony. *Exhibit "A."*

**A.        Tort Claims**

12.        Defendants assert the various tort claims asserted against them in their individual capacity should be dismissed with prejudice because the negligence and tortuous interference claims are barred by the statute of limitations. Dr. Suter asserts that Defendants Perry, Cassill, Gracy, Gdovin and Bower were negligent in failing to ensure that the conditions of her offer of employment were satisfied. She further alleges Defendants Perry, Cassill, Gracy, and Bower made representations to her as officials and employees of UTSA in the course of UTSA's business regarding the start up resources that would be provided to her if she accepted the offer of

employment; that these Defendants supplied false information regarding the resources that would

be provided; that Defendants supplied the information regarding start up resources for Dr. Suter's

guidance in deciding whether or not to accept UTSA's offer of employment; and defendants failed

to exercise reasonable care or competence in confirming and/or communicating the terms and

conditions of Dr. Suter's offer.   Finally, Dr. Suter asserts she had a valid contract of employment

and Dr. Gdovin and/or Dr. Bower willfully and intentionally interfered with the contract by failing

to ensure that RCMI funding was provided to Dr. Suter during the 2006/2007 grant cycle and by

willfully and intentionally providing resources that should have been allocated to Dr. Suter to Dr.

Santamaria instead.

13.     Dr. Suter agrees that these causes of action are subject to a two year statute of limitations,

however, limitations for these claims is subject to the discovery rule.   When no statute defines a

cause of action's accrual date, as in this case, common law determines the accrual date.   See

KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.; 988 S.W.2d 746, 750 (Tex. 1999). Under

common law, the accrual date is determined by the legal injury rule or the continuing tort doctrine.

The legal injury rule provides a cause accrues on the date the Defendant's wrongful conduct

caused injury. See Lubbock Cty. V. Trammel's Lubbock Bail Bonds, 80 S.W.3d 580, 585 (Tex.

2002).   However, the accrual date is deferred by the discovery rule until the plaintiff knows, or by

exercising reasonable diligence should know, of the facts giving rise to the claim if the injury is

inherently undiscoverable and objectively verifiable or was fraudulently concealed.

14.     An injury caused by a negligent misrepresentation is inherently undiscoverable. See

Matthiessen v. Schaefer, 27 S.W.3d 25, 31 (Tex.App-San Antonio, 2000, pet. denied).   An injury

which is objectively verifiable is one that can be demonstrated by direct, physical evidence. See

Hay v. Shell Oil Co., 986 S.W.2d 772, 777 (Tex.App.-Corpus Christi 1999, pet. denied).   Dr.

Suter claims that no one ever informed her that any portion of her equipment funds was contingent on a carry forward request and that if she had known she would not have accepted the offer of employment. Dr. Suter relied on representations that the lack of funds for her to purchase equipment was being resolved. *See Exhibit "A."*

15.      An injury caused by fraudulent concealment is deferred by the discovery rule until the plaintiff learns, or should have discovered, the deceitful conduct.   See Earle v. Ratliff, 998 S.W.2d 882, 888 (Tex. 1999). Fraudulent concealment occurs if the defendant 1) has actual knowledge of the injury producing conduct; 2) concealed the conduct by misrepresentation or silence when he had a duty to speak; 3) had a specific purpose to conceal the conduct; and 4) the plaintiff reasonably relied on the misrepresentation or silence.  See Shaw v. Moss, 67 S.W.3d 836, 841 (Tex. 2001). The evidence demonstrates that each of the Defendants knew that the RCMI portion of Dr. Suter's equipment funds was to be provided from a carry forward request, yet none of them informed Dr. Suter of this fact.

16.      According to Dr. Suter, she first learned from Dr. Gdovin that her RCMI equipment funds were coming from a carry forward request that the University was going to cover in October 2006.   Dr. Suter did not learn that Dr. Cassill was aware of this fact until he testified to this fact in his deposition after this suit was filed.   Dr. Suter first learned that Dr. Perry claimed he knew about the carry forward request in September 2006 when she asked him about the situation in June 2009.   She didn't learn he knew about it from the beginning until he testified in his deposition in this case.   Dr. Suter first learned that Dr. Bower knew about the carry forward request from documents produced in discovery in this case and from Dr. Bower's deposition testimony in this case. *Exhibit "A."*

17.      Limitations is an affirmative defense that the Defendants have the burden to prove.

Defendants have failed to establish as a matter of law that the limitations period is not deferred by the discovery rule on either basis; that the injury was not inherently undiscoverable and objectively verifiable or that the injury wasn't fraudulently concealed. A genuine issue of material fact precludes summary judgment on the basis of limitations since the Defendants have failed to affirmatively establish that the discovery rule does not apply to Dr. Suter's claims of negligence, negligent misrepresentation, and tortuous interference.

**B.    Breach of Fiduciary Duty**

18.     Defendants' claim they do not owe a fiduciary duty to Dr. Suter and that it is barred by limitations. As stated above, limitations is an affirmative defense that Defendants have the burden to establish.   The discovery rule applies to a breach of fiduciary claim since courts have held that injuries arising out of a breach of a fiduciary duty are inherently undiscoverable. See Computer Assocs. Int'l, Inc. v. Altai, Inc., 918 S.W.2d 453, 456 (Tex. 1994).   Defendants have failed to affirmatively establish that Dr. Suter knew or should have discovered that they breached their duty to her on or before July 16, 2010.

19.     Defendants further assert that they do not owe a duty to Dr. Suter citing City of Midland v. O'Bryant, 18 S.W.3d 209, 216 (Tex. 2000).   However, that case does not stand for the proposition that there is no fiduciary duty in the employee/employee relationship. Instead, the court considered whether an employer owes a "duty of good faith and fair dealing" to its employee, and concluded that is not a recognized cause of action. Moreover, a fiduciary duty has been recognized in the employee/employer relationship, See Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d 193, 201-02 (Tex. 2002) and can also arise when one party has a high degree of trust, influence or confidence in another. See Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171, 176 (Tex. 1997). A fiduciary relationship is created when one person places special confidence in

another, who in equity and good conscience, is bound to act in good faith and with due regard to

the interest of the one placing the confidence. See Texas Bank & Trust Co. v. Moore, 595 S.W.2d

502, 507 (Tex. 1980).

20.     Dr. Suter asserts that Defendants Perry, Cassill, Gracy, Gdovin and Bower had a duty to

act on her behalf to ensure that RCMI grant funds were provided to her in accordance with

UTSA's written offer of employment. Dr. Suter asserts that relied on the defendants in their

respective capacities as Dean of the College of Sciences, Chair of the Department of Biology, PI of

the RCMI program, Program Director of the RCMI program, and PI of the Faculty Development

Core component of the RCMI program, to act on her behalf to ensure the start up resources would

be provided as promised. Moreover, Dr. Perry admits that a large part of his job is to ensure the

success of all members of the College of Science.   *See Exhibit "A."*   A genuine issue of material

fact exists regarding whether or not these defendants owed Dr. Suter a fiduciary duty and summary

judgment should be denied on this basis.

**C.   Tort Claims Act**

21.     Defendants next assert the tort claims act bars the Plaintiff's claims citing Franka v.

Velasquez, 332 S.W.3d 367 (Tex. 2011).   However, this reliance is misplaced. In relevant part,

the Franka decision recognizes that "public employees (like agents generally) have always been

individually liable for their own torts, even when committed in the course of employment, and suit

may be brought against a government employee in his individual capacity. See id at footnotes

71-73 citing Miller v. Keyser, 90 S.W.3d 712, 717 (Tex. 2002); Leonard v. Abbott, 366 S.W.2d

925, 928-929 (Tex. 1963); House v. Houston Waterworks Co., 31 S.W. 179, 181 (Tex. 1895); and

City of El Paso v. Heinrich, 284 S.W.3d 366, 372, 373 n.7 (Tex. 2009). The Franka case does not

preclude suits against individual employees for their own torts, even when committed in the course

of employment.   Moreover, Defendants failed to comply with the requirements of §101.106(f)

accordingly, this is not a proper ground for summary judgment.

**D.      Breach of Contract**

22.        Defendants claim Dr. Suter's breach of contract claim is barred by limitations and that

Defendant Perry and Bower did not contract with her individually. Once again, Defendants have

failed to establish that limitations bars this claim as a matter of law since Defendants have failed to

establish that Plaintiff knew or should have discovered the breach of her contract on or before July

16, 2010.   Summary Judgment on the basis of limitations is clearly inappropriate since a genuine

issue of material fact exists regarding when Dr. Suter knew or should have known that these

defendants breached their promises to her.

23.        Defendants next assert that they cannot be held liable for breach of contract in their

individual capacity.   However, none of the cases cited by Defendants stand for this proposition.

In fact, one case relied on by the defendants holds to the contrary. See Maxey v. Citizens Nat'l

Bank, 507 S.W.2d 722, 726 (Tex. 1974)(officers or directors may be liable if they fail to act in

good faith).   Defendants have failed to establish that Dr. Suter is not authorized to assert a cause

of action for breach of contract against them individually.   Summary judgment should be denied

on this ground.

**E)   Equal Pay Act Claim against Dr. Barea-Rodriguez**

24.        Defendants assert Dr. Suter's equal pay act claim should be dismissed against Dr.

Barea-Rodriguez individually. Defendants argue this claim is redundant and not authorized.

However, defendants fail to consider the definition of employer under the EPA which is part of the

FLSA, and that individual liability under the EPA is clearly established. "Employer" is defined as "any

person acting directly or indirectly in the interests of an employer in relation to an employee." See 29

U.S.C. §203(d). Individuals who are substantially involved in decisions affecting the terms of the

Plaintiff's employment may be held individually liable for EPA violations. See Donovan v. Agnew, 712 F.2d 1509 (1st Cir. 1983); Riordan v. Kempiners, 831 F.2d 690, 694-95 (7th Cir. 1987); Donavan v. Sabine Irrigation, 695 F.2d 190, 194-95 (5th Cir. 1983) cert. denied, 463 U.S. 1207 (1983); Donovan v. Grim Hotel Company, 747 F.2d 966 (5th Cir. 1984) cert. denied, 471 U.S. 1124 (1985); and Reich v. Circle C Investments, Inc., 998 F.2d 324 (5th Cir. 1993). Considering the law is clearly established that individual liability is authorized under the EPA, summary judgment on this basis should be denied.

**F)   Official/Qualified Immunity**

25.     Defendants assert it is "undisputed" that nothing more that administrative errors or misjudgments give rise to the claims in this suit referring to paragraphs numbered paragraphs 12-14 of the motion.   Defendants further assert the defendants worked in good faith to facilitate Dr. Suter's research citing to numbered paragraphs 16 & 18. Plaintiff objects to the Defendants' motion to the extent there is no evidence that any of the individual Defendants acted in good faith. Not a single defendant has claimed he acted in good faith, and none of the evidence defendants refer to in the motion establishes the good faith of any defendant.

26.     The verification of Dr. Suter precludes summary judgment on the basis of immunity. *Exhibit "A."*   Dr. Suter's verification establishes that no other reasonable person in the position of the individual defendants would have acted or failed to act to ensure she had the funds she needed to establish a laboratory at UTSA. All of Plaintiff's evidence must be accepted as true and all credibility determinations are resolved against Defendants and in favor of Plaintiff.   Considering Dr. Suter's verification, the court must accept her evidence as true and deny summary judgment on this basis.

**G)   Equal Pay Act Claims**

27.     Dr. Suter asserts that she has been denied equal pay on the basis of her gender, female. Defendant Barea-Rodriguez has authorized and/or approved higher pay levels for male faculty

despite that female faculty, including Dr. Suter equal perform work "which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, as male faculty.

28.    A plaintiff makes a prima facie case of unequal pay by showing that an employer compensates employees differently for equal work. Once the Plaintiff makes a prima facie case, the burden shifts to the defendant to "prove by a preponderance of the evidence that the wage differential is justified under one of the four affirmative defenses set forth in the Equal Pay Act, either by a seniority system; a merit system; a system which measures earnings by quantity or quality of production; or any other factor than sex." See Siler-khodr v. UTHSCSA, 261 F.3d 542 (5th Cir. 2001) citing Kovacevich v. Kent State Univ., 224 F.3d 806, 826 (6th Cir. 2000) (citing 29 U.S.C. § 206(d)(1)).

29.    Plaintiff has established her prima facie case of unequal pay; Dr. Suter's affidavit shows that UTSA pays Assistant Professors in the Biology Department differently for equal work. *Exhibit "A."*   The burden then shifted to Defendants to prove by a preponderance of the evidence that any difference is pay is justified because of seniority, merit, quantity or quality of production, or any other factor. Defendants have not established by a preponderance of the evidence that any pay difference is justified.   Defendants do not even evaluate the pay differential which is clearly evident in the attachments to Dr. Barea-Rodriguez's affidavit.  Moreover, Dr. Barea-Rodriguez only explains the difference in merit pay between Dr. Suter and Dr. Santamaria, and he describes his general practice of relying on a self-evaluation submitted for his review which he sometimes adjusts for his knowledge and understanding of performance in the areas scored.

30.    Plaintiff objects to the affidavit of Dr. Barea-Rodriguez since there are no documents from which to verify any of the self-serving statements to justify any pay differential between Dr.

Suter and Dr. Santamaria. Plaintiff further objects to the extent Dr. Barea-Rodriguez fails to include evidence which can be objectively verified to justify his explanation for the difference in pay. Dr. Suter's verification clearly shows that any difference in pay between herself and Dr. Santamaria is unjustified.  Defendants failed to satisfy their burden of proof to establish by a preponderance of the evidence that the wage differential between each of the assistant professors in the Biology department was justified because of seniority, merit, quantity or quality of production, or any other factor.   Since Defendants failed to carry their burden of proof, summary judgment on this ground should be denied.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that after consideration of the above and foregoing, this court find that Defendants failed to establish entitlement to summary judgment and that genuine issues of material fact and law preclude summary judgment in this case. Plaintiff requests all other relief to which she may be entitled.

Respectfully submitted this the 10th day of June, 2011.

> **LAW OFFICE OF REGINA BACON CRISWELL, PLLC**
> Carriage Place
> P.O. Box 1399
> San Antonio, Texas 78023-1399
> TELEPHONE: (210) 681-7303
> FACSIMILE: (210) 680-3990
>
> /S/ *Regina B. Criswell*
> REGINA BACON CRISWELL
> TBN: 01496580
> *Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

This is to certify that on the 10th day of June, 2011, I electronically filed the foregoing with the clerk of the court using the CM/ECF system which will send notification of such filing to counsel of record:

Lars Hagen
Office of the Attorney General
*Attorney for Defendants*

/S/ *Regina B. Criswell*
REGINA BACON CRISWELL